Filed 6/23/23  P. v. Pantoja CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL PANTOJA,<br><br>    Defendant and Appellant. | F083581<br><br>(Super. Ct. No. 1423449)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Nancy A. Leo, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Petitioner Daniel Pantoja petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for first degree murder (§ 187). The superior court conducted an evidentiary hearing and denied the petition on the grounds petitioner was a major participant in the underlying felony who acted with reckless indifference to human life and, alternatively, directly aided and abetted in the murder with intent to kill.

On appeal, petitioner contends the evidence is insufficient to support the superior court's findings that he was major participant, acted with reckless indifference, and acted with intent to kill. We affirm.

**PROCEDURAL AND FACTUAL HISTORY**

**I.      Underlying Convictions**

Petitioner was charged, together with T.D. and J.P., with murder (§ 187, subd. (a); count I) and attempted carjacking (§§ 215, subd. (a), 664; count II). As to both counts, it was alleged the crime was committed for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that a principal personally and intentionally discharged a firearm, proximately causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)). Petitioner's motion to sever trials was granted, and dual juries were empaneled, one for petitioner's trial and the other for the trial of T.D. and J.P. (*People v. Diaz* (2018) 21 Cal.App.5th 538, 541 (*Diaz*)[2]; *People v. Pantoja* (Oct. 27, 2020,

_____

[1] Undesignated statutory references are to the Penal Code. Since petitioner filed his petition, former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

[2] Our decision in petitioner's direct appeal was partially published. (See *Diaz*, *supra*, 21 Cal.App.5th 538; see *id.* (Mar. 20, 2018, F071348), as mod. Apr. 10, 2018 [nonpub. opn.].) The nonpublished portions of the opinion fall within the exception to the California Rules of Court, rule 8.1115(b)(1). Petitioner previously requested to augment the record on appeal with the opinion. We construed the request as a request for

2.

F079427) [nonpub. opn.] (*Pantoja*).) As discussed in greater detail below, "[t]he prosecution presented evidence to both juries that showed T.D. was the actual killer. [Citation.] In addition, J.P. testified before both juries that T.D. fired the fatal shots." (*Pantoja*, F079427.)

J.P. was acquitted. T.D. was convicted on count I of first degree murder committed during the commission of an attempted carjacking, and on count II of attempted carjacking. His jury found the firearm discharge allegation true, but the gang allegation not true. Petitioner was similarly convicted on counts I and II, but his jury was unable to reach unanimous findings on the enhancement allegations, and those allegations were subsequently dismissed on the prosecutor's motion. (*Diaz*, *supra,* 21 Cal.App.5th at p. 541; *Pantoja*, *supra*, F079427.) Petitioner was sentenced to a term of 25 years to life, plus two years, six months. On appeal, we affirmed the judgment but remanded for the limited purpose of affording petitioner the opportunity, pursuant to *People v. Franklin* (2016) 63 Cal.4th 261, to make a record of information relevant to his eventual youth offender parole hearing. (*Diaz*, at pp. 546–547; see *Pantoja*, F079427.)

## II.     Initial Proceedings on Section 1172.6 Petition

Petitioner filed a petition for resentencing pursuant to section 1172.6. The superior court found he established a prima facie showing he was entitled to relief and appointed counsel, but failed to issue an order to show cause and instead proceeded to deny the petition on the merits without holding an evidentiary hearing. Petitioner appealed, and we reversed the order denying the petition and remanded with directions for the court to issue an order to show cause and hold an evidentiary hearing. (*Pantoja*, *supra*, F079427.)

judicial notice and granted it. Accordingly, we will deny as moot respondent's request for judicial notice, which was presented in respondent's brief.

## III.  Briefing on Remand

On remand, the People argued petitioner was not entitled to resentencing because he was a major participant in the carjacking who acted with reckless indifference to human life and, alternatively directly aided and abetted in the murder with intent to kill. The People asked the court to take judicial notice of our prior opinions in petitioner's direct appeal and his appeal from the initial denial of his section 1172.6 petition, as well as the entire court file in the underlying action and the record of the two appellate matters.

In response, petitioner argued he was not guilty of murder under current law because he was not a major participant in the carjacking and did not act with implied malice. He argued the evidence relied on by the People for a contrary conclusion was irrelevant or was not credible. Additionally, petitioner argued the court could not consider the gang evidence presented at trial, inasmuch as the jury did not reach a verdict on the gang allegation. Petitioner's brief purported to "incorporate[] by reference" (boldface omitted) the trial transcripts and trial exhibits.

## IV.  Evidentiary Hearing

At the evidentiary hearing, the parties relied on testimony from petitioner's trial and two surveillance videos that had been entered into evidence at trial. Additionally, petitioner called live witnesses at the evidentiary hearing. We describe below the evidence and argument that was before the superior court when it considered petitioner's petition for resentencing.

### A.  Trial Evidence[3]

The offenses at issue in this case arose from the fatal shooting of Chaz Bettencourt outside a gas station convenience store in Riverbank in the early morning hours of

---

[3] The People asked the superior court to take judicial notice of the record of conviction and the entire court file, including the transcripts and exhibits from petitioner's trial. Petitioner likewise relied on the trial transcripts and trial exhibits. The

August 5, 2010.[4]  The events leading up to the murder took place at several locations. The convenience store where the shooting took place was located on the corner of Oakdale Road and Patterson Road.  A market visited by petitioner and his codefendants prior to the shooting was located approximately one half to three quarters of a mile away on Patterson Road.  A movie theater was located between the market and the convenience store.

Between 10:30 and 11:00 p.m. on August 4, Timothy G. and Derek P.[5] left Timothy's house in Riverbank to walk a female friend home.  Their route took them past the movie theater and the convenience store.  As the trio was passing the movie theater, Timothy saw three people wearing white shirts, who appeared to be males, on the corner about a block away.  Derek went over to them, then returned and said he was going to buy the three some alcohol and make some money.  Timothy took the woman the rest of the way to her home.

Surveillance video taken from the market showed Derek entering the market shortly before 11:00 p.m., followed by J.P., T.D., and petitioner.  The video revealed that J.P. was wearing jeans and a dark shirt and cap, while T.D. and petitioner were wearing white shirts and dark caps.  Petitioner and his companions looked at some items in the store, and fingerprint analysis showed T.D. and petitioner handled a small package of cigars on the counter.  J.P. purchased a bag of chips.  Derek purchased two beverage

---

court did not expressly address the People's request for judicial notice, but relied on the trial record in its ruling.  We previously granted petitioner's request for judicial notice of the record on appeal in petitioner's direct appeal, case No. F071348.  Although our summary is in many respects similar to the factual summary presented in *Diaz*, *supra*, F071348, our summary of the evidence is based on our own review of the record from petitioner's trial and the trial of his two codefendants.  (See § 1172.6, subd. (d)(3).)

[4] Unspecified dates are to the year 2010.

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

cans. The video showed T.D. fiddling with his pants and waistband through his time at the market.

Timothy passed through the parking lot behind the movie theater around 11:00 p.m. or shortly after and saw the three men he earlier had seen talking with Derek. The men jumped the fence from an adjacent school yard into the movie theater parking lot. He heard at least one person loudly yelling gang identifiers. Timothy passed them, then turned and looked over his shoulder. The three were walking in the direction of the convenience store.

Meanwhile, David G. got off work at midnight. As he was driving home, he saw his friend, Chaz Bettencourt. David asked if Bettencourt wanted to go to the convenience store with him. Bettencourt got into the passenger seat of the car and they drove to the convenience store. This was around 12:35 a.m. on August 5.

David parked on the left side of the store, right in front of the door. While he was getting his money together, Bettencourt got out of the car and went inside. As David exited the vehicle, he noticed three males walking toward him from the direction of the gas pumps. David glanced at them, then went inside the store. Store surveillance video showed petitioner, T.D., and J.P. walking across the parking lot toward the store. As they neared David's vehicle, petitioner split off from the others and walked behind David's vehicle, toward the passenger side, while T.D. and J.P. moved in the direction of the store entrance, closer to the driver's side of the vehicle.

As David walked into the store, Bettencourt was already at the register, either purchasing something or talking to the clerk. David, who intended to buy some iced tea, noticed the three males were leaning against the store windows, right in front of his car. As David made his purchase, Bettencourt walked outside and waited by the passenger door of the car.

6.

As David exited the convenience store, T.D. acted like he was walking away from the store toward the gas pumps. He then came behind David, pointed a gun in his face, and started demanding the keys to the car. Store surveillance video showed T.D. pointing the gun toward the back of David's head and then his face. At that time, according to David, petitioner and J.P. were still standing in front of the car. T.D. said, "Give me your fucking keys. I will blast you." When David looked at the gun, T.D. racked the slide back, cocking the gun, and said in an intimidating tone of voice, "This is real."

David started backing up with his hands up, although he did not turn over his keys. He was focused on the gun and did not know what petitioner and J.P. were doing at that point. Store surveillance video showed J.P. and petitioner following T.D. as he and David backed toward and around the trunk of the car. David went around the trunk and along the passenger side toward the hood. T.D. followed with the gun pointed at David's face. David did not know where Bettencourt was and did not hear him say anything. David was still focused on the gun. David moved toward the convenience store doors, where there were security cameras and lights, and T.D. stayed by the hood of the car.

As David backed toward the front door of the convenience store, J.P. came from behind and started blocking him, using his body to push David away from the doors. J.P. told David that he "need[ed] to go back over there," toward the bathrooms, where it was very dark and there were no security cameras. J.P. said he had a gun. Although he never displayed a firearm, J.P. reached down into his pocket and shook it around, as if he was going to pull out a gun. David did not know where petitioner was at this time. David tried to get past J.P. Their bodies were in contact for about 15 seconds. Surveillance video showed David and J.P. struggling against the doors of the convenience store.

J.P. moved out of the way and went back toward David's car. David got inside the convenience store and told the clerk to call 911, and that the assailants had a gun. About 10 to 15 seconds later, he heard two gunshots. They sounded like they came from the direction of his car. David could see his car, but did not see any bodies.

7.

M.C. was pulling up to the gas pumps outside the convenience store when she saw "a few guys" on the side of a car parked in front of the store. One shot the other one twice from several feet away. She could not recall where the shooter and victim were standing at the time of the shooting, except that they were near the car.[6] At least two other young men were standing near the front of the car. The one who was shot ran toward the gas pumps and fell. "[A] bunch of kids" ran on the other side of the store. They wore baggy clothes and looked "thug-ish." M.C. was in shock and did not know what to do, so she just left.

David stayed inside the store for another 20 to 25 seconds, but did not see anyone. When he went outside, he found Bettencourt lying on his back some distance from David's car. Petitioner, T.D., and J.P. were gone.

At approximately 12:45 a.m. on August 5, Stanislaus County Sheriff's Deputy Moss was on patrol in Riverbank when he was dispatched to the convenience store. When he drove into the parking lot, he saw Bettencourt, lying on his back. David was standing over him. Bettencourt was alive but unresponsive. He had sustained two gunshot wounds to the chest. He subsequently died from his injuries.

David's vehicle was parked to the west of the front door of the convenience store. In each of the two parking spaces to the west of the passenger side of the vehicle was a black cloth shoe. A spent .22-caliber shell casing was found west of the front door of the store, close to the building and near the front passenger side of David's vehicle. A black shoe was found south of the convenience store in the parking lot for other businesses. A small, semiautomatic, .22-caliber handgun, with the serial number scratched off, was found in the dirt near bushes about 100 yards south of the convenience store.[7] There was

---

[6] At different points, she testified the shooter and victim were on the side of the car, on the side of the car closest to the store door (i.e., the driver's side), near the car, near the passenger door, and near the rear driver's side of the vehicle.

[7] At trial, David identified this gun as the one T.D. pointed at him.

an expended shell casing still in the chamber. It appeared the gun had jammed. Next to the gun was a .22-caliber magazine that contained eight rounds of ammunition. Two bullets were recovered from Bettencourt's body. One had rifling characteristics similar to bullets that were test-fired from the gun recovered near the scene, although a conclusive determination could not be made. The other recovered bullet was too heavily damaged for comparison. The expended cartridges were determined to have been fired in the pistol.

Timothy learned of the shooting when he woke on the morning of August 5. Wondering if the three individuals he had seen walking toward the convenience store were involved, he sought out Derek and learned Derek had purchased Four Loko for them. Timothy then went to the back fence of a schoolyard adjacent to the movie theater, where he had seen the three jump down into the movie theater lot, and found a Four Loko malt beverage can. He left it there and notified the sheriff's department.[8] T.D.'s and petitioner's DNA was found on the can, which was 23.5 ounces in size.

On August 6, David was shown two photographic lineups. David immediately identified a photograph of T.D. and said he was the person holding the gun. David was unable to recognize anyone in the lineup containing petitioner's photograph. After J.P. turned himself in on August 12, a photographic lineup containing his picture was shown to David. David was unable to identify J.P.

Petitioner's mother, Kellie S., testified in both the prosecution and the defense cases. Around 4:00 p.m. on August 4, she saw petitioner, T.D., and J.P. together at her

---

[8] Timothy spoke to Stanislaus County Sheriff's Deputy Bennett, who seized the empty can. Timothy told Bennett that he had seen three subjects climbing over the fence from the school side into the theater parking lot. Timothy described them as being two Hispanics and one Black person. He said they were throwing gang signs and shouting gang identifiers and they threatened to "kick [his] ass." Timothy told Bennett one was holding a can of "Four Clowns" beer, which he threw over the fence into the yard of the school.

house. She did not recall seeing any of the trio with a firearm and did not recall them having any conversation regarding a firearm. She estimated the trio left the house shortly before dark and returned to her house on August 5, while it was still dark. At petitioner's request, she drove them to T.D.'s home in Turlock. During the drive, she overheard petitioner say to T.D. and J.P., "I can't believe you did that, Bro." She dropped the three off at T.D.'s house and returned home. While driving home, she had a telephone conversation with petitioner, in which he told her, "[T.D.] shot somebody, Mom. He's stupid." She recalled petitioner telling her, "They were trying to take his car." She confirmed that petitioner used the word "they." Petitioner told her that he heard a "[p]op, pop," and turned to see the victim take a couple of steps and then fall, after which petitioner, T.D., and J.P. took off running. Petitioner cried during the phone call. She recalled hearing a conversation going on in the background but could not recall what was said. Kellie relayed this information to Stanislaus County Sheriff's Detective Hatfield during an interview on August 6. At trial, she confirmed petitioner received a settlement from a car accident shortly before the shooting, but she did not know how much he received or what he did with the money.[9]

Hatfield also testified. According to Hatfield, Kellie told him that, prior to the shooting, she heard T.D. ask petitioner if he "had the piece." However, Kellie did not see any gun on the day of the shooting. Kellie also told Hatfield about a conversation she overheard while she was on the phone with petitioner during her drive home. Kellie reported that she heard T.D.'s mother say something to the effect of, "Why did you point the gun at him and shoot him for?" Kellie heard T.D. reply, "That's what you do when you point a gun at someone, isn't it?"

---

[9] Petitioner's stepfather reported to Hatfield that petitioner purchased a .22-caliber handgun with the settlement money approximately two weeks prior to the shooting. However, this evidence was presented only to T.D. and J.P.'s jury, and not petitioner's jury.

Extensive gang evidence was presented at trial. Because the evidence is of limited relevance to the resentencing petition, we summarize it briefly and generally. Petitioner was identified as a suspect in an apparent gang-related beating that took place at a gas station in Redding on June 6. A MySpace page attributed to petitioner contained a link to the beating surveillance video and a gang-related comment regarding the video. Petitioner later admitted to law enforcement that he was depicted in the video. On July 22, a few days before the shooting, T.D., J.P. and petitioner were together at the Stanislaus County Fair. A sheriff's deputy saw T.D. making what appeared to be a gang sign and the group was told to leave the fair. When T.D.'s residence was searched on August 6, law enforcement encountered T.D.'s biological father, who had visible gang tattoos. On September 13, T.D. and petitioner were located inside the Redding residence of a known gang member.

The People's gang expert presented extensive background testimony regarding the operations of the relevant local gangs and gang subsets. He opined that petitioner's MySpace page contained numerous gang references. He opined that petitioner and T.D. were active gang members. He opined that J.P. was not a gang member, but rather a trusted associate of the gang. In response to a hypothetical question based on the prosecution's evidence concerning the charged offenses, the expert opined that the events benefited the gang, were committed in association with the gang, and were committed by gang members and an associate acting together. A defense gang expert provided extensive testimony disagreeing with the testimony of the People's expert.

J.P. testified in the defense case. He was 15 years old when he was arrested in this case. Both his parents are African American. Neither was gang affiliated.

Prior to his arrest, J.P. resided in Turlock, about five blocks from Columbia Park. He often went there to play, as there were always other people there. He met T.D., who lived across the street from the park, about five months before the events of this case. They met at a barbecue given by a friend of J.P. After that, they "[k]ind of maybe a little

11.

bit" became friends. They played basketball together at the park, and they went to the fair the one night. J.P. met petitioner a couple of times when petitioner was at the park with T.D. Except for the first time J.P. met T.D., if T.D. was present, petitioner was also there. These occasions usually involved playing basketball and/or smoking marijuana.

J.P. denied being a gang associate.

J.P. had not been to Riverbank before August 4. That afternoon, J.P. was with "Ray Ray." Originally, J.P. was supposed to go to Ray Ray's house in Modesto, but he and Ray Ray saw T.D. and petitioner at the bus stop. T.D. and petitioner said there was a party in Riverbank that night. Ray Ray could not go because he had other commitments, but J.P. decided he would attend. J.P. had $30 or $35 that he got either from his mother or from doing chores for his aunts. He also had some marijuana in a bag. J.P. had smoked a blunt (a small cigar in which the tobacco had been replaced with marijuana) before he got on the bus. J.P. was a regular user of marijuana and had built up a tolerance for it. It made him relaxed and mellow.

The four rode the bus from Turlock to Modesto, where they had to switch buses to continue on to Riverbank. Ray Ray left them at the bus stop in Modesto, and T.D., petitioner, and J.P. then took the other bus to Riverbank. There was no discussion about committing crimes. J.P. did not know T.D. or petitioner had a gun.

When the three got off the bus and were walking to petitioner's house, they saw an ice cream man who was pushing a cart. Petitioner told T.D. and J.P. to "watch this," that he was going to get the ice cream man. There had been no discussion about robbing the ice cream man, but petitioner pulled a gun from his waist. His shirt had been over it. Petitioner crossed the street to the ice cream man, pointed the gun at him, and demanded money. The man put up his hands, and petitioner reached into the man's pocket and took the money. Petitioner then got on a bicycle he had had with him since J.P. first met up with them, and rode off. T.D. knew where petitioner lived, and he and J.P. kept walking to petitioner's house. Once there, nobody talked about what had happened. Petitioner

12.

had gotten around $70 or $80. J.P. did not ask for or receive any of it. He did not think T.D. was given any of it, either.

At petitioner's house, petitioner, T.D., and J.P. smoked marijuana and watched television. Petitioner's parents left, and petitioner had to babysit his younger siblings. Around this time, T.D. and J.P. went to a place nearby that sold "taco truck burrito[s]," and they each ate one. They then returned to petitioner's house.

Up to that point, nobody had been drinking any alcohol. Petitioner telephoned his mother and then his stepfather and asked them to get Four Loko from the store. When petitioner's stepfather returned to the house, he gave petitioner four cans of Four Loko. J.P. did not drink any. Petitioner and T.D. each drank one, then the three left the house. As they were walking, petitioner and T.D. were each drinking another one. The three had also shared about three blunts by that time. All J.P. knew was that the party was supposed to be later that day. Because he had never been to Riverbank, he did not really know where they were supposed to be.

After leaving petitioner's house, the three walked to a store down the street, where they got more cigars.[10] They then went to the home of someone petitioner knew, where they smoked more marijuana. J.P. was feeling the effects of the marijuana. He was relaxed.

The three left after about 15 to 20 minutes and started walking again toward the party. They saw Derek, whom J.P. had never met. At the market, Derek bought them cans of Four Loko. J.P. merely purchased a bag of chips with his own money.

The three left the market and walked to the school behind the movie theater. As far as J.P. knew, they still had plans to go to the party. At the school, they went up on the roof, smoked marijuana, and petitioner and T.D. drank. Petitioner and T.D. each had a

---

[10] The cigars J.P. favored could be purchased individually or in a pack. The three bought them individually. T.D. and petitioner appeared to have their own money.

13.

can of Four Loko. J.P. did not remember if they passed it back and forth, who finished first, or whether they shared the last part of the last can.

The three stayed on the roof for a little while, then got back down. There were benches at the school, and they went and "chilled" on the benches, smoking marijuana and a regular cigar, for about 10 minutes. After that, they climbed over a wall. J.P. believed petitioner and T.D. were drunk. J.P. did not recall anyone shouting anything gang related or seeing Timothy. He did not see anyone throwing gang signs. There was no discussion whatsoever about gangs.

J.P. thought "he" finished his can of Four Loko and threw it over the fence, but he did not remember clearly.[11] The three then walked around to the front of the theater. There were two older ladies coming from the movies. Petitioner suggested they rob the ladies and he pulled out the same gun he had used earlier. J.P. refused, saying something like, "That's stupid," or "Why would you want to rob ladies?" T.D. agreed and said, "Yeah, that is stupid." J.P. did not intend to rob anybody and did not urge T.D. or petitioner to rob someone. Still holding the gun, petitioner said to T.D. or both T.D. and J.P., "Don't bitch up," or "Don't get soft." T.D. then said he wanted to see or to hold the gun, and petitioner gave it to him.[12] T.D. did not say anything about committing a robbery, and the three did not discuss committing robberies.

---

[11] J.P. was not asked to specify whether "he" referred to T.D. or petitioner.

[12] D. Wallace, a private investigator working on petitioner's behalf, had, through his experience and observations, an enhanced ability to observe and recognize when someone was carrying a concealed handgun. In his opinion, the surveillance video from the market showed T.D. checking his waistband and adjusting his pants in a manner that suggested he was carrying a handgun in his waistband while inside the store. He could not say for certain what was under T.D.'s shirt, however. Wallace acknowledged he had seen a number of men at the courthouse, pulling up their pants in the same way and yet getting through the metal detector. J.P. also acknowledged T.D. was adjusting his pants at the market, but he did not think it was because he had the gun.

Wallace also investigated J.P.'s account of the robbery of the ice cream man. He was unable to find any evidence any such robbery occurred.

14.

The three headed to the convenience store down the street so petitioner could buy more cigars to hollow out for marijuana. There was no discussion about doing anything of a criminal nature. J.P. had no intention of committing a crime. J.P. did not go inside with petitioner, because, although petitioner was old enough to buy cigars, there was a possibility the clerk might not sell to him if he thought petitioner was buying for a minor. There was no plan to commit a crime.

As they approached the convenience store, petitioner broke away from J.P. and T.D. and said something to them, but J.P. could not recall what was said. At one point, J.P. testified they did not go into the convenience store because he was getting ready to give petitioner some money to buy cigars. Later, however, he testified that they did not go inside because T.D. had pulled out a gun. T.D. pulled the gun on David, who was coming out of the store and walking toward his car. T.D. had not said anything to J.P. or petitioner prior to pulling the gun. There had been no discussion about robbing David. Bettencourt was on his cell phone on the other side of the car. Nobody said anything to Bettencourt before T.D. pulled the gun. When the gun was pulled, J.P. was behind T.D., although he was not sure how far. Petitioner was beside J.P. The gun was tucked into T.D.'s waist, under his shirt.

T.D. pulled the gun, put it in David's face, and told David to give him his keys. David had his hands up. He had a drink in one hand and the keys in the other hand, and he told T.D. that he was not going to give him the keys. Neither J.P. nor petitioner said anything, but, as David and T.D. went around the car, J.P. walked behind T.D. He did not know why, as he had no intention of stealing a car or robbing anyone, or of acting as a gang associate.

At some point, T.D. put his hand on top of the gun and slid it back. David broke away from T.D. and started toward the store door. Bettencourt was standing in the parking lot. Petitioner was next to J.P. T.D. pointed the gun in the direction of petitioner, who was still beside T.D., and yelled to get the doors. J.P. stood in front of the

15.

doors of convenience store. He did not say or do anything to suggest he had a gun. He did not touch David, except that they were "shouldering" each other as David tried to get past J.P. to get inside the store. J.P. did this because T.D. had pointed the gun in his and petitioner's direction and told them to get the door. J.P. was scared. He did not know whether T.D. would fire, and felt anyone could have gotten shot.

David got past J.P. J.P. saw Bettencourt standing in front of T.D., on the side of the car. T.D. pointed the gun at Bettencourt, between his chest and his nose, and yelled to give him the money. Petitioner also was yelling at Bettencourt but J.P. did not know what he was saying. J.P. did not recall petitioner's location.[13] Bettencourt took money from somewhere and threw it toward T.D.'s face. J.P. then saw T.D. shoot twice. J.P. ran. T.D. and petitioner also ran, although T.D. picked up the money. J.P. never asked for or received any of it.

Petitioner knew someone who lived around the corner from the convenience store, so the three hopped the fence into the person's backyard. T.D. and petitioner appeared to be drunk. As either T.D. or petitioner was hopping over the fence, he fell into the doors and the doors opened. A lady was walking in the kitchen, and petitioner told her that he knew her brother. The lady got her brother, who went into the garage with the three. At some point, T.D., who seemed kind of surprised, said he dropped the gun and lost one of his shoes at the convenience store. The brother gave T.D. a shoe. Petitioner told the brother they had been at a party and someone was shooting at them, and that they needed a ride.

---

[13] However, on cross-examination, J.P. stated petitioner was "[s]omewhere behind or to the side of [T.D.]" when he was yelling, and was "around" T.D. at the time of the shooting.

The three were given a ride to petitioner's house. Petitioner talked to his mother, who came out, looking shocked and upset. She took them to T.D.'s house in Turlock. Petitioner's mother then told T.D.'s mother what happened. T.D.'s mother asked T.D. why he did it. J.P. believed T.D. responded, "If I did it once, I can do it again."

J.P. then left. He was almost across the street when petitioner and T.D. came out of the house. The three crossed Columbia Park, hopped a couple of fences, and went to the house of a girl J.P. knew. T.D. had a shotgun in a case in his hand and a small leather pouch full of shotgun shells. While the three were walking across the park, T.D. said that if any cops were to pull up, he would just start shooting at the cops. He said that if he went to prison he would be "on the main line" with his father. T.D. told J.P. not to snitch.

The three were the only ones at the house. J.P. was lying on the couch by himself, and T.D. and petitioner were talking to each other and joking. They asked J.P. what was wrong with him and why he was so down. J.P. told them it was not a game, and that somebody just got shot. J.P. felt a bit intimidated because there was a shotgun present and the others did not feel the way he did. T.D. told J.P. not to snitch and nothing would happen.

The three stayed at the girl's house from about 4:00 a.m. until around 5:00 a.m. or 6:00 a.m., when T.D.'s mother came, and petitioner and T.D. left with her. She asked if J.P. wanted to go, but he declined. He stayed at the girl's house for a while, then went home. That was the last time he saw either petitioner or T.D. outside of court. J.P. later turned himself in.

In March 2012, J.P. was interviewed by the prosecutor's investigator and the prosecutor. J.P.'s attorney requested, but was not present during, the meeting. J.P. gave the statement so he would not have to spend the rest of his life in prison. He thought he might get some kind of deal, although that did not happen. J.P. told the investigator and the prosecutor the truth and did not refuse to answer any of their questions.

17.

Dr. Marczinski, an associate professor of psychology at Northern Kentucky University, testified to T.D. and J.P.'s jury as a defense expert in alcohol mixed with energy drinks (AED). With regard to petitioner's jury, the parties stipulated Marczinski would testify that, as sold in August 2010, Four Loko was a mixture of alcohol and energy drink. Drinking an AED such as Four Loko will cause the same intoxicating effects in humans as any other alcoholic beverage with the same amount of alcohol content. In some cases, drinking an AED like Four Loko can cause the observable effects of alcohol intoxication to be masked or hidden to the drinker and people observing the drinker. One can of Four Loko, as found by Timothy at the school, contained 23.5 fluid ounces of beverage. The alcohol concentration of that beverage was 12 percent by volume, which was the same percentage of alcohol as most wine. Each 23.5-ounce can of Four Loko contains the alcohol and intoxicating equivalent of 4.7, 12-ounce cans of beer or 4.7, five-ounce glasses of wine. Marczinski watched the market and convenience store videos and observed no objective symptoms of alcohol intoxication exhibited by T.D., J.P., or petitioner. Some typical objective symptoms of alcohol intoxication include lack of balance, falling down, vomiting, slurred speech, and passing out.

### B.      New Evidence at the Evidentiary Hearing

At the evidentiary hearing, the People entered into evidence the convenience store surveillance video. They otherwise relied on the transcripts of petitioner's trial and the trial exhibits, and did not present new evidence.

Petitioner entered into evidence the market surveillance video. He also called private investigator Wallace as a hearing witness. Wallace worked petitioner's case at the time of his trial and again for the section 1172.6 resentencing hearing. He again testified he had experience attempting to spot people carrying concealed firearms. Petitioner played the market surveillance video while Wallace testified that T.D. appeared to have something heavy, like a firearm, in his pants. However, J.P. and petitioner did not, at any time during the video, have the same trouble keeping their pants

18.

up. Wallace testified that, at one point in the video, T.D.'s shirt pulled "somewhat more snugly over his right hip and you can see something of a sharp angular nature up here underneath his shirt," suggesting there was a "firearm present." Wallace testified that he saw "more evidence of [T.D.] carrying a firearm or something of that nature in his waistband," particularly the angular object in his waistband, than he had previously testified to. He also noticed T.D. appeared to be looking down in the area on his waistband, and Wallace opined T.D. was "checking on the visibility of the firearm." Wallace opined that T.D. appeared to have a firearm in his possession and J.P. and petitioner did not.

Wallace also testified that he mapped out the route he believed petitioner, T.D., and J.P. took from the bus stop to petitioner's home in Riverbank. He personally visited the bus stop closest to petitioner's mother's residence. He also visited the residence and traced the walking route between the bus stop and the residence. He noted that J.P. reported that they robbed an ice cream vendor on the walking route from the bus stop to the residence. Wallace spent "at least weeks" investigating the alleged robbery but was unable to corroborate J.P.'s account of the ice cream robbery. He did not find or talk to any ice cream vendors, let alone any who had been robbed. The Riverbank Police Department had no record of any such robbery. He additionally talked to two or three wholesalers who sold ice cream to ice cream vendors and none of them had knowledge of any of their customers being robbed. He also talked to grocery stores and others selling ice cream to determine where they got their ice cream. None of them knew of any robbery. However, Wallace acknowledged not every crime is reported.

On cross-examination, Wallace acknowledged he did not have training in spotting people carrying concealed weapons. He acknowledged that, in the market surveillance video, both T.D. and petitioner were wearing baggy clothes that could conceal a firearm. He also acknowledged that he did not see a gun in the video. He acknowledged that someone who is accustomed to carrying a firearm would not be as concerned about his

19.

appearance as someone who was not accustomed to carrying a gun. Wallace did not know if T.D. habitually fiddled with or habitually pulled up his pants or underwear.

Petitioner also called T.D. as a witness at the hearing. T.D. testified he had known petitioner since childhood but had not been in communication with him since T.D. was released from prison. T.D. had viewed the market surveillance video and noticed that he appeared to be tugging on his waistband or pants several times. He acknowledged it appeared he had a gun in his waistband. He did not recall whether anyone purchased alcohol for the trio at the market. T.D. did not recall petitioner giving him the gun he was alleged to have used during the shooting. He did not recall where the gun came from. He did not recall anything from that night, including whether anyone told him to shoot Bettencourt.

Petitioner also testified at the hearing. He testified that, at the time of the shooting, T.D. was his friend, and he knew J.P. through T.D. The three of them were together in Riverbank on the day of the incident and spent hours walking from place to place. They first visited petitioner's mother's house at approximately 1:00 p.m. From there, they walked to a school behind the movie theater, looking for someone to buy them alcohol. They eventually found someone who agreed to buy them alcohol and they went to the market, where the man purchased them Four Lokos. Petitioner knew T.D. had a handgun in his waistband at the market.

The trio left the market and went back to the school to drink. After a couple of hours, they left to get more alcohol. As they approached the convenience store, they had no plans other than finding someone to purchase alcohol for them. One car was parked at the convenience store. David and Bettencourt got out of the car and went into the convenience store as petitioner and his companions walked up.

Petitioner, T.D., and J.P. walked to the front window of the convenience store and stood near the wall. Petitioner stood approximately five feet from the car. At some point, David and Bettencourt exited the store. David went to the driver's side door and

20.

Bettencourt went to the passenger side door.  T.D. left the wall and went toward David and the driver's side of the car.  T.D. pulled the gun on David and said something, and they both walked behind the car.  Petitioner and J.P. followed toward the back of the car "a couple of seconds later."  Bettencourt was at the passenger side of the car and David took off running toward the front of the store.  T.D. pointed the gun at petitioner and J.P. and told them to get David.  Petitioner stood there and J.P. chased David.  J.P. caught David and wrestled with him to try to physically stop him from going in the store, but he was unsuccessful.  While they wrestled, petitioner was by the wall of the store where he started.

While petitioner was standing there, T.D. went to Bettencourt.  He pointed the gun at Bettencourt and demanded money.  Bettencourt pulled out money and threw it at T.D.'s face.  T.D. then shot Bettencourt.  Petitioner ran, as did J.P. and T.D.  Petitioner ran because he was scared.

Petitioner denied giving T.D. the gun or giving T.D. or anyone any orders regarding what was to happen at the convenience store.  Petitioner did not have a gun and, to his knowledge, J.P. did not have a gun.  However, T.D. had the gun throughout the day.  Petitioner denied that he robbed an ice cream man.  He denied that he had considered robbing "two old ladies."

On cross-examination, petitioner confirmed that he, J.P. and T.D. took a bus to Riverbank on the day of the shooting, and walked approximately two blocks to his mother's house.  There, they drank one Four Loko that his stepfather purchased for them and took another of the Four Lokos with them as they walked through Riverbank in the evening.  They spent time drinking at an elementary school before they saw some people walking in an adjacent movie theater parking lot and asked them to purchase alcohol.  T.D. had a gun at the time they went to the market, and petitioner did not recall where T.D. obtained it.  T.D. had carried the gun with him a few times previously.  Petitioner had seen the gun earlier in the day when he woke up at T.D.'s house.

21.

As petitioner and his companions walked up to the convenience store, the plan was to get someone to buy them alcohol. They saw David and Bettencourt getting out of the car as they walked up, but did not ask David and Bettencourt to buy them alcohol because by that point they were already in the store. When David and Bettencourt exited the store, petitioner and his companions did not ask them for alcohol. When T.D. pulled the gun on David, he was approximately 10 feet in front of petitioner. Petitioner followed a couple of seconds after T.D. and heard T.D. ask David for the keys to the car. By the time David got past J.P. and into the store, petitioner was "[p]robably by the front" of the store. He was approximately 10 feet away from T.D. Once T.D. pointed the gun at petitioner, petitioner did not move. After T.D. pointed the gun at Bettencourt, petitioner said, "Hey, let's go." Although T.D. had not shot anyone at that point, petitioner "guess[ed] he would have used [the firearm]." T.D. then shot Bettencourt and petitioner ran.

Petitioner admitted that he was charged in 2010 with assault with a firearm, assault with force likely to cause great bodily injury, shooting at an occupied motor vehicle, discharge of a firearm with gross negligence, and trying to dissuade a witness. Additionally, prior to the instant offense, petitioner assaulted a man at a gas station convenience store in Redding, but was found not guilty of assault and pled no contest in 2019 to a violation of section 186.22, subdivision (d). Petitioner also was charged with or convicted of offenses while incarcerated, including a 2017 conviction for possession of drugs in prison (§ 4573.6), a charge for conspiring with his mother to bring drugs into prison, and a 2019 conviction for possession of drugs in prison (§ 4573.8).

### C.    Ruling

The court determined the People had met their burden of proving, beyond a reasonable doubt, that petitioner was guilty of murder based on the testimony at trial. With regard to the disputed factual issues, the court noted it found compelling the testimony of petitioner's mother, who overheard a statement regarding petitioner

22.

furnishing the weapon, and also found compelling the video evidence, which corroborated J.P.'s trial testimony.  The court specifically found petitioner was a major participant in the underlying offense and acted with reckless indifference to human life, and alternatively that the conviction could be sustained because petitioner "aided or abetted or assisted in the commission of the murder" with intent to kill.  Accordingly, the petition for resentencing was denied.

## DISCUSSION

### I.  Applicable Law Regarding Section 1172.6

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  The bill accomplished this task by adding three separate provisions to the Penal Code.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)  First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought before he or she may be convicted of murder.  (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842-843.)  Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶]  (3) The person was a major participant in the underlying felony and acted with reckless

23.

indifference to human life, as described in subdivision (d) of Section 190.2."[14] (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense "to seek relief under the two ameliorative provisions above." (*Gentile*, *supra*, 10 Cal.5th at p. 843.) Relevant here, this procedure is available to persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a).)

Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)-(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate

---

[14] Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672.)

24.

opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

## II. Sufficient Evidence of Felony-murder Liability

The superior court found petitioner was ineligible for resentencing because the prosecution had proved beyond a reasonable doubt that he was guilty of murder as a major participant in a qualifying felony who acted with reckless indifference to human life. Petitioner contends the evidence was insufficient to support these findings. We disagree.

### A. Standard of Review

We review the superior court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) In doing so, we review the facts in the light most favorable to the People and presume in support of the court's ruling the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

### B. Applicable Law Regarding Felony Murder

Since the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) provides that a participant in a qualifying felony where a death occurs may be liable for murder if the person was "a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a

25.

qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court sought to clarify the circumstances under which "an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Id*. at p. 794.) The high court identified the following nonexhaustive factors as relevant to this inquiry: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.) However, "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid*.)

The following year, in *People v. Clark* (2016) 63 Cal.4th 522, 614-623 (*Clark*), the high court addressed the "reckless indifference" standard. The court explained that reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) The court further explained that reckless indifference to human life has both a subjective and an objective component. (*Ibid.*) Subjectively, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, " '[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its

26.

disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' " (*Clark*, at p. 617.) The fact that a felony involves a gun is insufficient, by itself, to support a finding of reckless indifference. (*Id.* at pp. 617–618.)

In *Clark*, the high court provided the following nonexhaustive list of factors to be considered in determining whether the defendant acted with reckless indifference: (1) knowledge of weapons, and use and number of weapons; (2) physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) duration of the felony and period of interaction between the perpetrators and the victims, (4) the defendant's knowledge of his or her cohort's likelihood of killing, and (5) the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) Like the factors considered in *Banks*, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Notably, *Banks* and *Clark* derived their holdings from *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), the prevailing Eighth Amendment jurisprudence regarding the circumstances under which the death penalty permissibly may be imposed for felony murder. (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393.) Our Supreme Court has explained that *Enmund* and *Tison* together establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and had no culpable mental state at the other. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) We briefly describe the facts of *Enmund* and *Tison* to give context to this spectrum.

The defendant in *Enmund* was a getaway driver for a robbery. He sat waiting in his parked car a few hundred feet away from the home where his two confederates fatally shot an elderly couple when they resisted. (*Enmund*, *supra*, 458 U.S. at p. 784.) The high court emphasized the defendant "did not kill or attempt to kill," and the record did

27.

not support a finding he had "any intention of participating in or facilitating a murder." (*Enmund*, at p. 798.)  As such, imposition of the death penalty, which must be based solely on a defendant's own culpability, was constitutionally disproportionate.  (*Ibid*.)

The facts of *Tison* are starkly different.  There, two brothers helped their father and his cellmate—both convicted murderers—escape from prison, arming the prisoners during their escape.  (*Tison*, *supra*, 481 U.S. at pp. 139, 150–152.)  When the group eventually experienced car trouble, one of the brothers flagged down a passing car for help while the other men laid in wait by the side of the road.  (*Id.* at pp. 139–140.)  The group then kidnapped at gunpoint a family of four in the passing car, robbed them, and drove them into the desert.  (*Id.* at p. 140.)  The brothers stood by while their father and his cellmate shot the victims repeatedly.  The group then left the family to die in the desert and drove off in the family's car.  (*Id.* at pp. 139–141.)  The high court emphasized that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result."  (*Id.* at pp. 157–158.)  The high court noted the brothers' substantial and active participation in the kidnapping and robbery implicated them in the resulting deaths, and the death penalty could properly be imposed under such circumstances where the defendants also exhibited reckless indifference to human life.  (*Id.* at p. 158.)

Our Supreme Court has explained that, "[s]omewhere between [*Tison* and *Enmund*], at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility."  (*Banks*, *supra*, 61 Cal.4th at p. 802.)

## C.     Major Participation

Substantial evidence supports the superior court's finding that petitioner was a major participant in the carjacking under the *Banks* standard.

As to the first *Banks* factor, petitioner's role in planning the criminal enterprise that led to one or more deaths, we note the record does not necessarily establish that petitioner planned to engage in a carjacking.  Nonetheless, the evidence is sufficient to establish petitioner planned to engage in some kind of armed felony, and that plan ultimately led to Bettencourt's death.  More specifically, there is substantial evidence that petitioner began the evening by arming himself with a firearm.  He then robbed an ice cream man at gun point and suggested to his companions that they rob two women leaving the movie theater.  When his companions declined, he told T.D. not to "bitch up" or "get soft" and gave him the firearm.  He did not appear to exhibit surprise when T.D. pointed the firearm at David and, instead, followed as T.D. pursued David around the back of the car.[15]

As to the second factor, petitioner's role in supplying or using lethal weapons, the evidence supports a finding that petitioner armed T.D. prior to the encounter while telling him not to "bitch up" or "get soft."  Although petitioner disputes his role in supplying the weapon, J.P. testified that petitioner possessed and displayed the firearm at different times before ultimately giving the firearm to T.D.  Additionally, petitioner's mother heard T.D. asking petitioner about the "piece" while the trio was at her house, and her testimony also suggested petitioner had the financial means to purchase a firearm based

---

[15] The People rely on gang-related evidence to support a theory that petitioner planned or encouraged the murder as the more senior member of the gang to which he and T.D. belonged.  However, we need not consider the gang evidence to conclude substantial evidence supports a finding that petitioner planned to engage in an armed felony.

on a recent legal settlement. We note the superior court expressly stated that it credited petitioner's mother's testimony.

As to the third factor, substantial evidence does not necessarily support a finding that petitioner was aware, prior to his arrival at the convenience store, of particular dangers posed by the crime, the weapons used, or the conduct of the other participants. Although T.D. and petitioner had been friends for many years, and evidence was presented to suggest T.D. had a history of behavioral issues and making threats of violence in school, it is not clear that petitioner was aware of that history. Nor would T.D.'s school history necessarily suggest to petitioner that his conduct would escalate to murder. That said, petitioner certainly became aware of the particular dangers posed by T.D.'s conduct during the course of the crime. By the time T.D. pulled the gun, pointed it at David, racked the slide, and told David he would "blast" him, petitioner was on notice of the likelihood the offense would escalate to deadly violence.[16] Again, petitioner did not appear to register surprise at the turn of events, and followed behind as T.D. pursued David around the car.

This leads us to the fourth *Banks* factor: whether petitioner was present at the scene of the killing and in a position to facilitate or prevent the actual murder, and whether his own actions or inaction played a particular role in the death. Petitioner was present at the scene of the killing. The time between T.D. pulling out the firearm and his firing of the fatal shots was relatively brief, just under one minute. However, during this time, T.D. pursued David around the car with petitioner and J.P. in tow. David fled and

---

[16] Petitioner argues the fact that T.D. did not shoot David would have indicated to petitioner that the incident *would not* result in deadly violence. We disagree. The encounter between the perpetrators and the victims escalated rapidly. Once David escaped to the convenience store doors, T.D. ordered the others to restrain him. Petitioner's own testimony at the evidentiary hearing acknowledged that, although T.D. had not shot anyone at that point, petitioner "guess[ed] he would have used [the firearm]." The evidence does not suggest petitioner understood T.D. was disinclined to use deadly force.

30.

J.P. pursued him, wrestling with him at the door of the convenience store. Petitioner stayed near T.D. and the car and yelled something at Bettencourt. T.D. demanded money from Bettencourt, which Bettencourt threw in his face before T.D. shot him. The shooting was not instantaneous, but rather was preceded by a series of events in which petitioner made no effort to minimize the risk of violence. Nor did petitioner attempt to intervene or cease his participation in the offense once it became apparent that the carjacking had been thwarted. His inaction contributed to Bettencourt's death.

Finally, we consider petitioner's actions once lethal force had been used. Petitioner did not attempt to render aid to Bettencourt. Rather, petitioner facilitated the trio's escape by taking them to a nearby home to hide. He then took the trio to his mother's house and obtained a ride for all of them to Turlock. From there, he remained with T.D., and the two ultimately were apprehended together in Redding. His conduct following the shooting does not indicate he repudiated T.D.'s conduct, but rather that he supported it and believed himself to be implicated in the murder. Petitioner's conduct notably contrasts with that of J.P., who attempted to break off from his cohorts shortly after the murder, and ultimately did so, eventually turning himself in to law enforcement.

Taken together, the foregoing constitutes substantial evidence to support the superior court's finding that petitioner was a major participant in the underlying felony.

### D.     Reckless Indifference

Substantial evidence also supports the superior court's finding that petitioner acted with reckless indifference to human life, as defined in *Clark*. The evidence regarding many of these factors overlaps with the evidence supporting the *Banks* factors.

As to the first *Clark* factor, petitioner's knowledge of the weapons used and the number of weapons, we have already explained that substantial evidence supports a finding that petitioner furnished, and therefore had knowledge of, the firearm used in the offense. We recognize, however, that the evidence suggests only one firearm was used.

31.

As to the second *Clark* factor, petitioner's physical presence at the crime and opportunities to restrain the crime and/or aid the victim, we have already explained that petitioner was physically present at the crime scene, had opportunities to restrain the offense but failed to do so, and also declined to aid Bettencourt after the shooting. (See *In re Loza* (2017) 10 Cal.App.5th 38, 53–54 [noting that a defendant who is present has " ' "an opportunity to act as a restraining influence on murderous cohorts" ' " and to "assist the victim"].)

As to the third *Clark* factor, the duration of the felony and period of interaction between the perpetrators and the victims, we acknowledge that the felony was relatively brief, lasting just under one minute. However, as we have explained, during that brief interval, the perpetrators had extensive interactions with the victims. Petitioner did not merely stand by during these interactions. Rather, he actively supported T.D. as he pursued David around the car, and stood near T.D. as T.D. demanded money from Bettencourt and ultimately shot him.

As to the fourth *Clark* factor, petitioner's knowledge of his cohort's likelihood of killing, we again acknowledge that the evidence does not necessarily suggest petitioner had prior knowledge T.D. was likely to kill. However, once T.D. pulled out the gun, pointed it at David, racked the slide, and told David he would "blast" him, petitioner had notice of T.D.'s likelihood of killing. Thereafter, he took no steps to repudiate T.D.'s conduct or minimize the risk of death.

This leads us to the fifth *Clark* factor, petitioner's efforts to minimize the risk of violence during the felony. Petitioner made no such efforts. To the contrary, his conduct – furnishing the weapon, telling T.D. not to "bitch up" or "get soft," following T.D. as he pursued David, and standing nearby yelling while T.D. demanded money from Bettencourt – only served to escalate the risk of violence.

32.

We recognize that some of the *Clark* factors do not weigh strongly in favor of a finding a reckless indifference. We are mindful, however, of our Supreme Court's admonition that no one of the *Clark* factors " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we must evaluate these factors under the totality of the circumstances to determine petitioner's place on the " 'spectrum of culpability.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) Having done so, we conclude this is not a close case. The evidence is sufficient to establish petitioner was recklessly indifferent to the risk to human life, and his disregard involved a gross deviation from the standard of conduct a law-abiding person would observe in his situation. (*Id*. at p. 677.)

We reject petitioner's contention that he did not act with reckless indifference because he was merely an "intoxicated teenager" who did not subjectively appreciate the risk of death the incident carried. These factors may be relevant to the reckless indifference inquiry. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 898 [intoxication]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091-1093 [age].) However, they do not overwhelm consideration of all the other factors. (See *Tison*, *supra*, 481 U.S. at pp. 142, 151–152, 158 [death sentence could constitutionally be imposed on 19 year old if he was a major participant who acted with reckless indifference].) Evidence of petitioner's age and intoxication were presented to the superior court, which nonetheless found petitioner acted with reckless indifference to human life.[17] The evidence does not undermine our determination that substantial evidence supports the superior court's finding.

---

[17] Significantly, that evidence suggests that petitioner and his companions did not exhibit any outward signs of intoxication.

## E.    Conclusion

In sum, substantial evidence supports the superior court's finding that petitioner was a major participant in the carjacking and acted with reckless indifference to human life.  These findings are sufficient to uphold petitioner's murder conviction under the law as amended by Senate Bill No. 1437 and, therefore, sufficient to affirm the denial of the petition for resentencing.  Accordingly, we need not, and therefore do not, determine whether substantial evidence also supports a finding that petitioner aided and abetted the murder with intent to kill.

## DISPOSITION

The order denying the petition is affirmed.


DETJEN, Acting P. J.

WE CONCUR:


SMITH, J.


MEEHAN, J.